Okay, the next case is number 14, 1809, Distributed Solutions, Incorporated, against the Air Force. Mr. Coulter, you're ready. Thank you, Your Honor. May it please the Court. My name is Tom Coulter. I represent Distributed Solutions, Inc., the appellant in this matter. I will refer to them as DSI as well throughout this argument. Before its contract with DSI, AFNAFPO had a continuous right to use a version of software that was about to become inoperable. Before we get to the merits, can I just ask you a few questions about the jurisdiction? Certainly. And I apologize in advance. I came down with a cold this morning, so I may cough through them. Suppose in 1978, when Congress enacted the waiver of sovereign immunity in the CDA, that it specifically intended to include only the enumerated NAPIs. It could have done that, right? It could have done that. Right. And so why isn't that what they did when they referenced the Tucker Act's listing of those enumerated NAPIs? I think the answer to your question, Judge Hughes, is that it's answered by the slattery opinion. Well, I understand that, and I know that's where you were going to go, but it seems to me whatever slattery says answers a different question than what Congress did in 1978 in the CDA. Slattery dealt with decades, if not a hundred years, of the NAPI doctrine as created and applied to the Tucker Act. But in the CDA, the Congress was enacting a different and separate waiver of sovereign immunity. You agree with that, right? It was enacting its own waiver of sovereign immunity in line with the language of the Contract Disputes Act. There's no question about that. But that language is identical to the language used in the Tucker Act for this very purpose. And in slattery, as Judge Price had pointed out, that language is any express or, I'm sorry, in the CDA, the language is any express or implied contract with any of the non-appropriated, including those of the non-appropriated fund activities described in the Tucker Act. So you would have that, read that as exemplary, not exclusive. Correct. But, and that seems a reasonable position. The problem is, isn't the legislative history very strongly against that reading? The legislative history was, there was certainly a lot of discussion about the NAPI doctrine in the legislative history. There's no doubt about that. There was similar discussion of the legislative history in the Tucker Act. But let's go back to the Senate report for the CDA. Sure. I mean, tell me you agree that it's quite clear what the Senate was thinking about, about how far the waiver of sovereign immunity goes for the NAPI. I mean, you agree with that, right? I mean, the language is very clear. It's only the enumerated NAPIs. It could have, it said in the report, it could have gone all the way and applied the waiver of sovereign immunity to every non-appropriated, you know, fund instrumentality. But it didn't. It select, it specifically said, we're just going to hold the line to the enumerated ones. That's right. You agree. So what am I supposed to do with that? That couldn't be any clearer what Congress's intent was in terms of how far the waiver of sovereign immunity was going to go with respect to the Contract Disputes Act. Again, and I hate to go back to it, but as Judge Bryson pointed out, there were, this court was very clear in its waiver of sovereign immunity limited to enumerated NAPIs at some point in time in the past with regards to Tucker Act, based on the same language and very similar legislative history that said we're only going to limit this to the enumerated NAPI. In the Slattery decision, this court decided that that legislative history actually was not definitive and supported an interpretation that would allow NAPIs to be subject to suit. But isn't there a different, I mean, there's a far different history of the Tucker Act with regards to the NAPI doctrine than there is with the CDA, isn't there? I mean, the Tucker Act was enacted a very long time ago and it didn't have the NAPI doctrine in it when it was enacted, right? It was created judicially by the courts over a number of years and then in reaction to that creation, Congress amended the Tucker Act to include certain specified NAPIs. And so what Congress was doing there was slightly different than what they were doing in CDA, which was creating a new waiver of sovereign immunity. Well, Your Honor, again, I guess what I'm asking is, I mean, you keep wanting us to go to the Tucker Act. Sure. And I understand that. I would be making that argument if I were you, too. But the CDA is a different waiver and short of putting in the language, the expressed statement that's in the legislative history, what else would they have had to do to limit it to the enumerated NAPIs? For whatever reason, Congress did not limit it and they could have said specifically, it is limited to the enumerated NAPIs. It said it includes. Isn't the reason they didn't do it is because in 1978, everybody understood that the Tucker Act was limited to those enumerated NAPIs, too. So there wasn't any occasion for them to go beyond that, although they specifically said we considered doing it and we're not going to. That may have been a reason. This is why... Let me ask you. I understand your argument on this. I mean... Sure. You... And flattery, I think, certainly undermines it. But don't we have binding precedent in PACRM-PTSA and the CDA portion of FRESH that is still good law? I mean, given that there are two different statutes with different legislative history, don't you think that we'd have to go on bonk to overturn PACRM? I do not, Your Honor, because again, if you look at just the language of the contract disputes act, and for whatever reason, that language was tied to the Tucker Act's language. And perhaps it was because at the time they didn't believe the Tucker Act involved any NAPI jurisdiction beyond those enumerated. But for whatever reason, that language of the contract disputes act is tied to the Tucker Act. But isn't... But doesn't that undermine your argument? If what we're talking about is Congress intended in 1978 to incorporate the bounds of the Tucker Act jurisdiction with regard to NAPI, then there's no dispute that it only included the enumerated NAPIs in 1978, right? It tried to track the language of the Tucker Act. Right, right. And the Tucker Act in 1978 specifically only included, understood by us, understood by the statute, understood by everybody, I think, only included the enumerated NAPIs. So I think your argument has to be that Congress intended to incorporate the Tucker Act jurisdiction. And if the court enlarged that jurisdiction over time, Congress intended to enlarge it as well. And Congress could very easily restrict that jurisdiction today. They could amend the CDA to be more specific. Isn't that a backward way of looking at sovereign immunity? Not when you tie your language to the Tucker Act. Why don't you move on to the merits? I don't want to eat up all your time and jurisdiction. Thank you, Ron. Getting back to the merits of this, DSI believes it is by... When FNAFA negotiated a contract with DSI, it received software that was usable and that was limited to a contractual right to use term. And the plain language of the agreement, as well as the board's own factual findings, support that very interpretation that DSI holds. That the language at issue here in Mod 22, this modification, which all parties agree, refers to Mod 15. And all parties agree Mod 15 contains all of the intellectual property rights between the parties. But that's not disputed, is it? That the dispute is the continuing rights that prevail. That is correct, Your Honor. And the only issue is the plain language is whether this modification refers to all of Mod 15 or only a part of it, as the government would have you believe. But this modification is pretty clear in what it says. And from the negotiations of the parties, it is clear that that is what DSI understood it to mean, to be its plain meaning of this modification referring to all of the modification, not just a part of it. So you don't think it's curious that the fact that there was no mention of some kind of recovery, some kind of renewed payment for the continuing rights? At what point in time, Your Honor? Well, that was the question. At what point in time? It's silent. It is silent. And the reason is that, Your Honor, my client, Distributed Solutions, was interested in getting into a contract with AFNAFPA that gave them entree to the Department of Defense and future business prospects. There is no doubt about that. And they were willing to concede that they would allow use of the created version of software under this contract for the term of the contract without charging a specific license right to use. That they were getting maintenance fees and they were getting other payments during the term of the contract. And what DSI, frankly, eventually intended was to move AFNAFPA to another product or if the contract ended, it had this limitation on the right to use that would allow it some recovery at that point in time. I guess the question is, if we conclude that Modification 15 clearly granted AFNAFPA these rights, is it Modification 22 that clearly truncates those rights? It is the plain language, Your Honor, that says this modification, not the escrow rights in this modification, is valid for the entire life of the contract. Is valid. That clearly encompasses all three of the rights involved in Mod 15. So does that mean your client's intellectual property rights are likewise truncated by Modification 22? I mean, there's three parts of Mod 15. That's right. The government's perpetual rights to use, the obligation to keep updating the code in the escrow. Yes, Your Honor. And then your company's IP rights. That's right. And then if you're trying to say that, well, all of that goes up in smoke at the end of the contract, then that also is a commentary on your IP rights. No, it's not, Your Honor. The parties, in fact, in the record, had long understood that the private contractor owned the software, and there's never been any dispute about that. Mod 15 means that you've earned that ownership. You're trying to get us to read Mod 22 as being really unambiguous, super unambiguous. That's right. Super unambiguous as to Mod 15. Well, that necessarily references the third provision in Mod 15, your company's IP rights. It does, in fact. And I agree with you that it would be unreasonable to understand the scope of your IP rights as being terminated at the end of the contract. But then, you know, logically, that also makes me think that, likewise, it's unreasonable to think that the government's right to use the software that it paid for also goes up in smoke at the end of the contract. But, Your Honor, the third prong that you're referencing of Mod 15 talks about two things. It confirms DSI's ownership of the software, which nobody disputed because we had purchased it through an asset purchase agreement that the government approved. There was no dispute about that. But it also puts restrictions on FNAFPO's right to protect that ownership interest by limiting the entities to which it can allow use of the software. That was the real import of the third prong. And so, if the mod were to end at the end of the contract, then, obviously, FNAFPO has no more rights, no more responsibility to protect DSI's ownership interest. That was the import of the third prong. That's why it makes perfect sense for the rights to end at the end of the contract. No more source code, no more use, and no more responsibility to protect the use of software you're no longer using. It's entirely consistent with our argument. Didn't Mod 15 also say that the government has the right to take the source code out of escrow and use it for its own purposes, build it out on its own, or even hire a third party to work on it? It does say that, Your Honor. But in order to use that source code, you've got to convert it to object code and put it into use. And the test of the record is clear that the duration of the use of source code is tied to the first prong of the right to use. And so, there is an ability to use the source code for whatever purpose FNAFPO wanted, to look at it, to create new source code. But to put it into operation, you needed a right to use. And that was limited by the first prong of the Mod 15. Do we have to get the parole evidence, extrinsic evidence, to understand the terms of this contract? Then, do we have to dismiss this appeal because the disputes provision in the contract limits your right to appeal? No, Your Honor. Under the, I don't know, Mineson case? No, Your Honor. You do not. All you need are the findings of fact by this court. I see that I'm into my rebuttal time. But the findings here are that FNAFPO was concerned about its right to use and the software that needed to continue to operate its IBPS system. It negotiated with DSI because DSI owned the software. FNAFPO had no other choice. DSI knew that FNAFPO's software was at risk and agreed to enter into a contract under certain terms. It sent a draft novation agreement to FNAFPO. In it, it said Mod 15 is complete and accepted, and that meant that it was going to kill those rights and start over with a new negotiation. FNAFPO knew that. They understood it and drafted language proposed as a counter proposal to DSI's language, which said this modification is valid for the entire life of the contract. FNAFPO knew exactly what was going on. It drafted language to address its concerns, and its counter proposal said this modification is valid for the entire life of the contract. DSI understood it at the time to be a limitation to the contract term. That was a compromise it could live with, and so it moved on to other aspects and negotiated the rest of the contract. It was non-controversial, and it's entirely in keeping with the circumstances at the time where the parties, where FNAFPO needed to get a deal done, or else it was not going to have operative software. So why was it willing to compromise from DSI's perspective? Because DSI was the only one that could provide it with operating software. Thank you, Your Honor. I'll say the rest of the report. That's it from the government. We'll save some rebuttal time. Thank you. Ms. Kershaw. May it please the Court, this Court should dismiss the appeal for lack of jurisdiction because unlike the 2014 Sufi case, which is cited in Note 1 of the reply brief, which involved the very same instruction, there is no Court of Federal Claims decision for this Court's review. This Court has no... I mean, you agree it's the same precise language. Why should we interpret the scope of the Waiver of Sovereign Immunity in the CDA differently from the Waiver of Sovereign Immunity in the Tucker Act? Because the issue here is what was the intent of Congress in 1978 when it adopted the Contracts Disputes Act. That's the issue in this case. In 1978, it was understood by Congress and also it was the holdings of the Court of Claims that jurisdiction did not extend to the Nafis and it was within that background that Congress went forward and adopted the Contracts Disputes Act. We're confronted with construing the exact same text that was being construed in Slattery, right? Well... The text in 1346 and 1491. That is the same language there. Do you know of a case where the same text that's referenced in another statute got the opposite construction in a subsequent decision from a prior decision? Well, here, the question is... You don't know of one, right?  I don't know of one either. I can't identify a case that answers Your Honor's question. But here, the statutory language can be reasonably construed as it was by this court in the Packram Pizza case, which is precedent of this court, where the court construed the language of the CDA as not extending jurisdiction to the Federal Circuit to review a board decision involving a Nafi. So why was Judge Bryson's dissent wrong in Mindson when he said we're wrestling with the exact same language in the CDA and the Tucker Act if this court in Bonk has already construed that text a very particular way and that particular way does great violence to Packram Pizza to the point where it's overruled? There were several prongs to this court's decision in the Slattery case, and one of the prongs is its analysis of the 1970 amendment and the legislative history. And the court viewed that legislative history as being Congress deciding to plug a judicially created loophole, I believe is the language, and that was the extent of Congress's intent. Here, Congress's intent, as shown in the Senate report that's quoted in our brief, pages 27 to 28, is very clear. Congress made a decision knowing that at that time the Court of Claims jurisdiction did not extend to all of the Nafis. Congress decided that there were sufficient remedies and that it did not need to extend What about the legislative history to the 1970 amendment of the Tucker Act, where I think it was the Senate bill tried to include all Nafis in the waiver of sovereign immunity to the Tucker Act, and then the House bill amended that, restricted it down just to the military exchanges, and then that's what actually passed. And nevertheless, you know, we in Bonk and Slattery said this sovereign immunity applies to all of the Nafis, and so we're kind of left in the same situation here as what happened in Slattery. The legislative history only goes so far, I guess is the point I'm trying to make. The legislative history regarding the Tucker Act only went so far, as this court stated, in Slattery. Here, the legislative history goes exactly to the question before the court. It addresses whether there should be included within the scope of the CDA any additional Nafis, and it states that because the existing remedies were viewed as adequate, the Congress would not go any further in extending CDA jurisdiction. And I would point out with regard to the existing remedies, the existing remedies for Nafi contracts were broad because they contained a disputes clause which was different from the disputes clause that would be found in other government contracts. The disputes clause extended to breach of contract as well as violations of the terms of the contract, and one case where this would be set out is the Rainbow Valley Corporation board case. Someone like DSI go to the Court of Federal Claims? That is where it should have gone. It should have appealed. So you agree that under the Wunderlicht Act, this case could still get reviewed in the Court of Federal Claims and then ultimately up here? Well, under the Wunderlicht Act, in addition to the Tucker Act, because the Wunderlicht Act is not itself a jurisdictional statute. There's Court of Claims decisions pointing out that the Wunderlicht Act is not jurisdictional. But yes, it could have appealed from the board decision to the Court of Federal Claims, which is precisely the route that was used in the 2004 Sufi case that this court decided. But that's only for cases that were still viable under the Wunderlicht Act, which has been repealed, right? Excuse me? I mean, the Wunderlicht Act has been repealed, right? Going forward, what would people in DSI's situation do? The facts in our case are just like the facts in... No, I understand. But let's say they're not covered by the Wunderlicht Act. It's been repealed. They didn't bring their claim in it. They bring a case to the board under the disputes clause. Can they still go to the Court of Federal Claims? They can bring a case before the board under the disputes clause and then appeal to the Court of Federal Claims under the Tucker Act. That's what DSI could have done. It's precisely the same NAFI that was... I'm not sure that we're on the same page on this. I understand in this case, because of the availability of the Wunderlicht Act, without the Wunderlicht Act, can they appeal a board decision to the Court of Federal Claims? The Wunderlicht Act is only a scope of review. Okay, I know, but you're not answering my question. Setting aside the Wunderlicht Act, is there anything that allows you to appeal a board decision to the Court of Federal Claims? The Court of Federal Claims has broad contract jurisdiction. Okay, so I see what you're saying, but how is that something that gives you a right of appeal? Wouldn't they have to just file in the Court of Federal Claims? They're not covered by the CDA, so they... How could they seek... And they're not covered by the Wunderlicht Act. How could they go to the board and then the Court of Federal Claims? They go to the board under the board's charter. That's how they went to... I understand that, but how would they... What gives the Court of Federal Claims a right to judicial review? Not a de novo Tucker Act action, judicial review of a board decision after the repeal of the Wunderlicht Act. It has broad jurisdiction pursuant to the charter. Over contract claims, but not judicial review. Do you know of any cases where the Court of Federal Claims gets judicial review? Apart from the Wunderlicht Act, it's judicial review of board cases. That's not the way it works, right? Going back to the CDA, they can either go to the Court of Federal Claims or they can go to the board, but they can't go to the board and then go to the Court of Federal Claims. The only thing that permitted them to do that previously was the Wunderlicht Act, but that's great. Well, in this case, the Wunderlicht Act still applies to DSI. I know, but I'm not asking you about this case. I think you've conceded that they could get this case to the Court of Federal Claims. I'm worried about what happens in cases going forward where the Wunderlicht Act doesn't apply because it was repealed. I knew a quick answer to the question. I'm sorry. That's okay. You can move on to merits. Okay. All right. If I could proceed to the merits then. Okay. In this case, the board correctly construed Modification 22 as a plain language not taking away the government's everlasting right to use the software. This was a right that was guaranteed to the government in Modification 15. The board read Modification 22 as being a series of paragraphs that went through the contractor's responsibilities and obligations under the contract and sat out all of those responsibilities. It was the modifications that assigned work to the contractor. The concern is that Modification 22, it doesn't limit itself to certain aspects of Modification 15. It just talked about Modification 15 in general. So why wouldn't Modification 22 then, you know, just by terms of normal interpretation apply to all aspects of Modification 15? Because it uses the language complete and it's in the context of all the other paragraphs which set out when work would be considered complete and accepted by the government. So this sentence which talks about being valid for the entire life of the contract and will not be considered complete until the contract is closed, the only thing that that can apply to is a responsibility, an obligation of the contractor. That's the only thing that could be considered complete and accepted by the government. And the only thing that could be considered complete and accepted by the government was the escrow obligations that were part of Modification 15. And that's what the board held. It read the paragraph in the context of all the other paragraphs which deal with contractor responsibility and obligations under the contract. It also stated that, it also construed it in light of the purposes of the agreement. The purposes of the agreement was to bring the novation agreement into the contract. And secondly, it construed it consistent with common sense. It doesn't make common sense that the government, having acquired this everlasting right to go forward and use this software for all times, would then give it up for no consideration, no cash, in a modification which was intended to bring on a successor. We also pointed to the FAR clauses which are part of the modification. And this is FAR Clause 42.1204I which says that the government is not obligated to pay any cost or expense resulting from the transfer, other than those that would have been under the original agreement. And there was no charge under the original agreement for using the software and the transfer did not change that. The board first looked at the language of the agreement, found that it did not unambiguously take away the government's right. And then DSI had made arguments based on the extrinsic evidence. So it went forward and it assessed the extrinsic evidence. And as we stated in our brief, and as DSI is making arguments which are contrary to the factual findings of the board, I'll point a few of them out here. First of all, the board made a finding that the proposal that was put forward by DSI did clearly or unequivocally communicate an intent to divest the perpetual right. This is a finding conclusion of the board and DSI in its briefs and today at all argument continues to argue contrary to that factual finding that was supported by the record. So DSI never put this perpetual right of the government on the bargaining table. And the government then responded with its own proposal which corrected an inaccuracy in terms of the contractor's responsibilities and pointed out that the responsibilities and modification 15 were not complete and accepted by the government, that they would continue on until the contract was closed. So in this case, we think the board's decision is very clear. The plain language does not support the interpretation that was put forward by DSI taking away the government's everlasting rights and secondly, the extrinsic evidence did not support the argument. No questions for Ms. Kirschner? Thank you, Ms. Kirschner. Thank you. Mr. Coulter, you have a couple of minutes to rebuttal. Thank you very much, Your Honor. Let me start very quickly with a couple of points on the merits. Again, we assert that the plain meaning is this modification is valid referring to all parts of the modification. The court, the board never found any other contrary interpretation. There is nowhere in this opinion where it says what that language means. What the government says it means is the escrow duties in this modification. You cannot get there without importing words into language drafted by the government and why it makes sense in this case is because the judge is fundamentally wrong in his assessment of what the parties knew during contract negotiations. He assumes that DSI knew that the language drafted by the government, this modification is valid for the entire life of the contract, meant that the government only was referring to escrow duties. That meaning was never communicated other than through the language that the government sent to DSI. On the other hand, he assumes that AFNAFPO had no idea that DSI was trying to limit its right to use. That is contrary to its own findings. DSI sent a proposal that said we're going to eliminate Mod 15 in its entirety. Janice Jones, the deputy director of AFNAFPO at the time said that language would have taken away what we had just put into the mod and would have affected our right to use IBPS forever. She was speaking for the IBPS team, not for herself. They met about that concern and others and drafted the language at issue that says this modification is valid for the entire life of the contract. That has to be read as referring to all three based on the court's own findings. Again, this is in the context of AFNAFPO having the right to use software perpetually that was going to be useless and so it was willing to negotiate. That's clear in the language that it sent back to DSI. DSI was reasonable in interpreting it in that very manner. In terms of complete and accepted, the reason complete is in there is because, Your Honor, if I could just finish this point. The reason that complete is in the language is because it was a direct response to DSI's proposal that the mod be considered complete. The language of and accepted is not in Mod 22, contrary to the government's statement. For these reasons, we have to confirm to reverse and remand the board's decision. Thank you.